United States District Court
Southern District of Texas

**ENTERED**

April 22, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **NICKEL BRIDGE CAPITAL, LLC** § | |
| *Plaintiff/Counter-Defendant,* § | |
| § | |
| v. § | |
| § | |
| **CLAUDE F. HENDRICKSON, III,** § | |
| *Defendant,* § | |
| § | |
| and § | **Cause No. 4:23-cv-1047** |
| § | |
| **INTERNATIONAL POWER SERVICES, LLC** § | |
| *Defendant/Counter-* § | |
| *Plaintiff/Third-Party* § | |
| *Plaintiff,* § | |
| § | |
| v. § | |
| § | |
| **JEFF YOUNG** § | |
| *Third-Party Defendant.* | |

**MEMORANDUM & ORDER**

Before the Court are two motions: (1) Defendants International Power Services, LLC ("IPS") and Claude Hendrickson's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 18), and (2) Plaintiff Nickel Bridge Capital, LLC ("NBC") and Third-Party Defendant Jeff Young's Motion to Dismiss IPS's Second Amended Complaint (ECF No. 23). The Court held a telephonic hearing on both Motions on April 4, 2024. After considering the parties' briefs, oral arguments, and the record in this case, the Court now **GRANTS IN PART AND DENIES IN PART** both Motions, and **GRANTS** Plaintiff **LEAVE TO AMEND** its complaint. The precise contours of the Court's ruling are set forth below.

## I.    BACKGROUND

Nickel Bridge is a company that, among other things, lends money to companies like IPS who seek capital, in exchange for purchasing accounts receivable and bonds. Pl.'s First Am.

Compl. ("Compl.") ⁋ 7 (ECF No. 15). IPS is the owner of energy assets, including power plants in Guatemala. Defs.' Second Am. Counterclaim ("SAC") ¶ 8; Compl. ¶ 8. Defendant Hendrickson is one of IPS's owners. SAC ¶ 7; Compl. ¶ 8. Counter-Defendant Young is a managing partner of NBC. SAC ¶ 7.

The parties' disagreement concerns alleged contracts, oral agreements, and promises made with and to each other in 2021, all relating to IPS's purchase and operation of its Guatemalan assets. The Complaint and Counterclaim each paint different pictures of the facts; the documents do not necessarily contradict one another, but they highlight different events. The Court must assume that the factual allegations set forth in the Complaint and Counterclaim are true for purposes of considering the respective Motions to Dismiss. *See Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). Accordingly, the Court will summarize NBC and Defendants' factual allegations separately.

### A. NBC's factual allegations

NBC alleges that, in June 2021, Defendant Hendrickson approached Young seeking a $1 million loan to acquire assets (primarily, a power plant) in Guatemala. *Id.* at ¶ 8. Hendrickson and IPS told NBC that this investment would garner immediate cash flow that would cover the plant's operational expenses; they did not provide NBC with much information, but communicated that they would share more details later, and that they needed to act quickly to seize the investment opportunity. *Id.* at ¶¶ 9–10.

At the time, NBC understood that "the parties would later memorialize their arrangement with a bond agreement." *Id.* at ¶ 10. NBC elected to make this initial investment due to (1) Hendrickson's representations that immediate cash flow would cover the power plant's operational expenses and (2) their prior dealings with Hendrickson and his colleagues. *Id.* at ¶ 9–11. Now,

NBC alleges that $479,999.77 of the principal of this initial loan remains unpaid. *Id.* at ¶¶ 37, 39.

After NBC's initial investment, it became clear that the power plant did not provide immediate cash flow to cover operational expenses. IPS asked for additional funds—unanticipated by NBC—to pay for the operation of the plant and associated purchase costs. *Id.* at ¶ 11. NBC also learned that IPS had additional owners who were involved who Hendrickson did not tell them about in their initial conversations. *Id.* In sum, NBC contends, "what appeared to be the purchase of a cash flowing business by familiar business associates turned out to be a potential money pit with operational shortfalls and a heavy need for operational funding with additional, unfamiliar ownership." *Id.*

Despite these initial disappointments, NBC tried to continue to "identify various ways to both assist IPS with capital needs as well as to structure business deals to help the cashflow and profitability of the company." *Id.* at ¶ 12. Notably, the parties executed a Security Capital Agreement (the "SCA") pursuant to which NBC purchased IPS's receivables. *Id.* In exchange for rights to collect the receivables, NBC transferred $10,273,793.00 to IPS. *Id.* at ¶ 17. To date, NBC has been paid only $7,771,037.64 on the receivables, leaving an outstanding balance of $3,043,481.31. *Id.* at ¶ 18.

Based on these events, NBC asserts six causes of action in its complaint. First, it asserts breach of contract claims against IPS and Hendrickson, based upon the SCA and on Hendrickson's personal guarantee of all obligations under the SCA if IPS defaulted. *Id.* at ¶¶ 15–19. Second, it asserts a conversion claim against IPS based on its failure to pay amounts due under the SCA. *Id.* at ¶¶ 20–26. Third, NBC asserts promissory estoppel claims against IPS and Hendrickson, based on NBC's reliance on "IPS and Hendrickson's promise to repay the initial loan and for the funds transferred to IPS to purchase receivables under the SCA." *Id.* at ¶¶ 27–32. Fourth, NBC asserts

quantum meruit claims against IPS and Hendrickson in connection with their failure to repay the initial $1,000,000 loan. *Id.* at ¶¶ 33–37. Fifth, NBC asserts an unjust enrichment claim against IPS, based upon the unpaid SCA balance and unpaid initial loan principal. *Id.* at ¶¶ 38–40. Sixth, NBC asserts a money had and received claim against IPS based upon the unpaid SCA balance. *Id.* at ¶¶ 41–43. IPS's Motion seeks to dismiss NBC's claims for conversion, promissory estoppel, quantum meruit, and unjust enrichment (that is, all of the claims except for breach of contract and money had and received).

### B.  IPS and Hendrickson's factual allegations

IPS and Hendrickson allege that, once IPS purchased the Guatemalan assets, NBC and Young made oral and written assurances that they would help IPS secure funding for fuel to power the Guatemalan power plants. SAC ¶ 8. On July 15, 2021, the parties entered into a contract that IPS refers to as the "Bond Agreement." *Id.* at ¶ 9. Pursuant to the Bond Agreement, "IPS agreed to issue a convertible loan . . . in the maximum principal amount of six million dollars ($6,000,000.00) through the issuance of sixty (60) bonds, each with a denomination of one hundred thousand dollars ($100,000.00)" and NBC "agreed to purchase all of the bonds issued by IPS." *Id.* The Bond Agreement also provided that IPS could not sell the bonds to any person or entity besides NBC, and that NBC would disburse the proceeds of the bonds within twenty-four hours after issuance. *Id.*

Defendants allege that IPS issued 30 bonds to NBC on July 21, 2021, but, despite its contractual obligations,  NBC never disbursed the payments of those bonds. *Id.* at ¶ 10. Defendants claim that NBC's failure to disburse payment meant that IPS could not purchase fuel in bulk and instead had to spend considerably more money over time on the spot market. *Id.* at ¶ 11. Further, Defendants allege that, "on information and belief," NBC used the bonds "in a manner that violates

4

the Bond Agreement, including as collateral for loans or other monies paid to NBC and Young." *Id.* at ¶ 16.

Throughout the second half of 2021, NBC and Young communicated via phone calls and written messages "that they could secure lines of credit for IPS's use." *Id.* at ¶ 17. In particular, IPS highlights two consequential representations NBC and Young made.

First, NBC and Young provided oral and written representations to IPS and AMEC Energy Corp. ("AMEC") that they had secured a four-million-dollar ($4,000,000.00) line of credit for IPS to use to acquire heavy fuel oil ("HFO") from AMEC. *Id.* at ¶ 17–18. IPS negotiated a purchase of HFO from AMEC in reliance on these representations, but NBC and Young ultimately did not provide the promised funding, and AMEC withdrew its agreement and refused to do any further business with IPS. *Id.* IPS asserts that it suffered at least $24 million in damages, in the form of lost profits, as a result of NBC and Young's actions. *Id.* at ¶ 18.

Second, NBC and Young represented to IPS that they had secured a forty-five-million-dollar ($45,000,000.00) line of credit to fund IPS's purchase of oil assets in Nicaragua ("Nicaraguan Assets"). *Id.* at ¶ 19. IPS relied on this representation "to enter into an agreement with the seller of the Nicaraguan Assets, conduct expensive due diligence, and draft the purchase agreement." *Id.* IPS alleges that it suffered at least $40 million in damages as a result of NBC and Young's actions. *Id.*

Then, once IPS was in a challenging financial situation, NBC and Young allegedly "offered an agreement to supply limited amounts of money in order to fund small amounts of fuel purchases at extremely high interest rates and fees" and "took actions to prevent IPS from acquiring funding from other sources." *Id.* at ¶¶ 20–21.

Lastly, Defendants assert that IPS paid Young $100,000 to secure IPS funding within the

necessary timeline, but that IPS "received no benefit in exchange for those payments." *Id.* at ¶ 22. Defendants refer to this agreement as the "Personal Services Contract." *Id.* at 6.

Based on these allegations, Defendants assert four counterclaims against NBC and Young. First, they bring breach of contract claims against NBC (based on its alleged breach of the Bond Agreement) and Young (based on his alleged breach of the Personal Services Contract). *Id.* at ¶¶ 23–31. Second, they bring fraud claims against NBC and Young arising out of their alleged misrepresentations. *Id.* at ¶¶ 32–40. Third, Defendants bring a money had and received claim against Young—this represents an alternative claim to its breach of contract claim against Young. *Id.* at ¶¶ 41–42. Fourth, Defendants bring tortious interference with prospective contracts claims against NBC and Young based upon their alleged misrepresentations. *Id.* at ¶¶ 43–47. NBC and Young seek dismissal of all of Defendants' claims against them.

## II.    LEGAL STANDARD

A court may dismiss a complaint or a counterclaim for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); *see generally Kansas v. Nebraska*, 527 U.S. 1020 (1999). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This must be more than "[a]n unadorned, the-defendant-unlawfully-harmed-me accusation" or "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a claim is plausible on its face only "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

6

In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

Additionally, allegations of fraud are subject to heightened pleading requirements under Rule 9(b). FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (quoting 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297, 590 (1990)). Put simply, Rule 9(b) requires "the who, what, when, where, and how" to be laid out. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir.1997)).

## III.    ANALYSIS

### A.  IPS and Hendrickson's Motion to Dismiss

Defendants IPS and Hendrickson move to dismiss Plaintiff's claims for conversion, promissory estoppel, quantum meruit, and unjust enrichment. In essence, Defendants argue that Plaintiff's breach of contract claim represents the "central thrust" of the lawsuit, and these additional claims represent "an apparent effort to unnecessarily expand and overcomplicate the case." ECF No. 18 at 1.

### i. Economic loss rule

First, Defendants argue that all of these claims are barred by the economic loss rule. "Under Texas law, the economic loss rule generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property." *Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804, 808 (5th Cir. 2020). Though "the Texas Supreme Court has unequivocally adopted a broad interpretation of the economic loss rule, *Memorial Hermann Healthcare System, Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008), it has "rejected a formulation of the economic loss rule that 'says you can never recover economic damages for a tort claim,'" *JPMorgan Chase Bank, N.A. v. Professional Pharmacy II*, 508 S.W.3d 391, 422 (Tex. App.—Fort Worth 2014, no pet.) (quoting *Sharyland Water Supply Corporation. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011)).

The Texas Supreme Court directs courts to apply the economic loss rule based on "an analysis of [the rule's] rationales in a particular situation." *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 246 (Tex. 2014). The rule has two primary rationales: (1) avoidance of indeterminate and disproportionate liability; and (2) deference to contract. *Id.* at 240. The former stems from the fact that "[a] single negligent utterance can cause economic loss to thousands of people who rely on it, those losses may produce additional losses to those who were relying on the first round of victims, and so on," such that a single defendant's liability would become "indeterminate and out of proportion to their culpability." *Id.* Allowing for such a risk strays from the general premise in tort law that liability is imposed for generally foreseeable damages. *Id.* Further, it may cause individuals to avoid certain activities altogether, so as not to expose themselves to unknown liability. *Id.* The latter rationale—deference to contract—reasons that risks of economic loss are better accounted for by contract law, rather than tort law, because (a) the

parties usually have a full opportunity to consider their positions and manage risks ahead of time, and (b) pecuniary remedies are fungible. *Golden Spread Elec. Coop.*, 954 F.3d at 808 (5th Cir. 2020) (citing *LAN/STV*, 435 S.W.3d at 240–41).

Thus, "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Sagebrush Sols., LLC v. David-James*, LLC, No. 3:14-CV-2701-G, 2015 WL 1011789, at *2 (N.D. Tex. Mar. 9, 2015) (quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)). One helpful guiding principle to assess whether the economic loss rule bars a plaintiff's claim is to inquire whether, if the defendant fully complied with the contract, the plaintiff could still sue in tort. *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 726 (5th Cir. 2015). If they could not, the economic loss rule bars their claim. *Id.*

Here, Plaintiff argues that the claims in question are not barred by the economic loss rule because they sound in contract, not in tort, and so the economic loss rule is inapplicable. *See Houston Medical Testing Servs., Inc. v. Mintzer*, 417 S.W.3d 691, 698 (Tex. App.—Houston [14th] 2013, no pet.) ("Quantum meruit is one type of 'implied-in-law' or 'quasi-contract'."); *Southwest Electrical Contracting Servs., Ltd. v. Indus. Accessories Co.*, Case No. 18-cv-00123, 2021 WL 5230802, at *4 n. 2 (W.D. Tex. Aug. 21, 2021) (holding that quantum meruit "sounds in contract," and therefore, "the economic loss rule is inapplicable to Plaintiff's quantum meruit claim"); *Killen v. Johnson & Johnson*, Case No. 3:20-cv-829, 2022 WL 330995, at *7 (S.D. Miss. Feb. 3, 2022) ("[A]n unjust enrichment claim sounds in contract and not in tort."). Given NBC's concessions regarding its conversion, quantum meruit, and unjust enrichment claims, *see infra*, the Court need not address whether the economic loss rule bars those claims. The rule's applicability to NBC's promissory estoppel claim, however, merits further discussion.

NBC bases its promissory estoppel claim on two of IPS and Hendrickson's promises: (1)

that they would "repay the initial $1,000,000 loan" and (2) that they would transfer funds to NBC pursuant to the terms of the SCA. Compl. ¶ 29. Notably, NBC does not bring a breach of contract claim in connection with its initial $1,000,000 loan. Thus, as an initial matter, NBC's promissory estoppel claim may proceed insofar as it alleges wrongdoing in connection with Defendants' promise to repay the initial loan.

Dismissal of the portion of NBC's promissory estoppel claim related to the terms of the SCA is a closer question. At the April 4, 2024 hearing, NBC clarified that this portion of its claim was an argument in the alternative, should Defendants contest the validity of the SCA.

Texas courts generally dismiss promissory estoppel claims where the promise in question is part of a valid contract. *See, e.g.*, *Guar. Bank v. Lone Star Life Ins. Co.*, 568 S.W.2d 431, 434 (Tex. App.—Dallas 1978, writ ref'd n.r.e.) ("If the promise in question is a part of a valid contract, the promisee cannot disregard the contract and sue for reliance damage under the doctrine of promissory estoppel."); *Tremble v. Wells Fargo Home Mortg., Inc.*, 478 F. App'x 164, 166 (5th Cir. 2012) ("For many years, Texas courts have held that promissory estoppel becomes available to a claimant only in the absence of a valid and enforceable contract." (quoting *Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) (collecting cases))); *Hua v. Wells Fargo Bank, Nat. Ass'n*, No. CIV.A. H-14-2427, 2014 WL 5877909, at *3 (S.D. Tex. Nov. 11, 2014) (dismissing promissory estoppel claim that was based on a contract where plaintiff "acknowledge[d] the existence of the [contract] and [did] not allege any facts that call into question its validity or enforceability"); *Boswell v. Pappy's Pet Lodge Grp., LLC*, No. 05-23-00040-CV, 2024 WL 396621, at *5 (Tex. App. Feb. 2, 2024) (dismissing promissory estoppel claim as barred by economic loss rule where claim arose entirely out of contract between parties).

On the other hand, however, Federal Rule of Civil Procedure 8(a) allows a plaintiff to plead alternative theories of relief. FED. R. CIV P. 8(a); see *Nat. Polymer Int'l Corp. v. Hartz Mountain Corp.*, 426 F. Supp. 3d 300, 310 (E.D. Tex. 2019) (holding that a plaintiff "may plead promissory estoppel and quantum meruit as alternative theories of recovery" to its breach of contract claim); *Miller v. CitiMortgage, Inc.*, 970 F. Supp. 2d 568, 588 (N.D. Tex. 2013) (stating that "a party to a contract may seek alternative relief under both contract and quasi-contract theories" (quoting *Woodcock v. Chase Home Fin.*, LLC, No. H–11–1199, 2012 WL 393260, at *3 (S.D. Tex. Feb. 3, 2012))); *Triumph Aerostructures, LLC v. Lockheed Martin Corp.*, No. 3:10-CV-2030, 2011 WL 1336399, at *1 (N.D. Tex. Apr. 6, 2011) ("[U]nder Texas law, 'a party may plead alternative theories of recovery in contract and quantum meruit, but if [it] proves the existence of an enforceable contract, [it] may not recover in quantum meruit.'" (quoting *Cole v. Benavides*, 481 F.2d 559, 561 (5th Cir. 1973))); *WHC Franchise Corp. v. Four JS Fam., LLLP*, No. 3:05-CV-0663-B, 2005 WL 8158394, at *1 (N.D. Tex. Nov. 30, 2005) (denying motion to dismiss, finding that "it would be premature to dismiss Defendants' promissory estoppel and unjust enrichment counterclaims in the nascent stages of this case," given defendants' "entitle[ment] under the federal rules to assert alternative theories of recovery"); *Infowise Sols., Inc. v. Microstrategy*, Inc., No. CIV.A. 3:04-CV-0553, 2005 WL 2445436, at *7 (N.D. Tex. Sept. 29, 2005) (noting that Rule 8(a) allows a plaintiff to plead both breach of contract or unjust enrichment claims but that a plaintiff may not recover under both claims for breach of contract and unjust enrichment).

At this stage, though no party has contested the validity of the SCA, the Court has not passed judgment on the SCA's validity or on the parties' obligations and rights under the agreement. Thus, it is premature to dismiss NBC's promissory estoppel claim, as this claim may be a viable pathway to recovery if the Court ultimately determines that the SCA is not a valid

contract . *See Sterett Equip. Co., LLC v. PH Steel, Inc.*, No. 1:22-CV-476, 2024 WL 1179788, at *11 (E.D. Tex. Mar. 19, 2024) (concluding that tort claims that represented "alternative theories of recovery" to breach of contract claim were not barred by economic loss rule at 12(b)(6) stage, reasoning that "[w]hether the economic loss rule bars certain claims may be determined only after the contract at issue has been interpreted and the rights of the parties under the agreement have been established"). Of course, if the Court ultimately determines that the SCA is a valid contract, it will necessarily dismiss NBC's promissory estoppel claim insofar as it relates to the terms of the SCA. At this time, however, NBC's promissory estoppel claim may proceed.

### ii. Conversion

In the April 4, 2024 hearing, NBC conceded that its conversion claim should be dismissed because the SCA contains a provision on wrongful retention of payments (the basis of its conversion claim). NBC also requested leave to amend its breach of contract claim to include allegations specific to Defendants' wrongful retention of payments; Defendants informed the Court that they were not opposed to NBC dropping their conversion claim and repleading. As such, the Court dismisses NBC's conversion claim and grants NBC leave to amend its breach of contract claim.

### iii. Quantum meruit

NBC notes that it "does not contest the argument regarding dismissal of [the quantum meruit] cause of action against Hendrickson in his individual capacity." ECF No. 24 at 17. Further, NBC concedes that its lending of money alone cannot support a quantum meruit claim. *See, e.g.*, *Lilani v. Noorali*, No. CIV.A. H-09-2617, 2011 WL 13667, at *12 (S.D. Tex. Jan. 3, 2011) (citing *Cristobal v. Allen*, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July 22, 2010, no pet.)). At the April 4, 2024 hearing, the parties agreed that the proper course of action at this

juncture is to dismiss NBC's quantum meruit claim and allow NBC to amend its complaint so that it may assert an assumpsit claim instead. As it noted in the hearing, the Court agrees with the parties, and, therefore, dismisses this claim and grants NBC leave to amend.

### iv.  Unjust enrichment

In the April 4, 2024 hearing, NBC conceded that this claim should be dismissed. *See Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, 999 F.3d 970, 972 (5th Cir. 2021) (collecting cases and explaining that, under Texas law, "unjust enrichment describes the nature of certain claims and remedies," and is "not a distinct cause of action itself"). Accordingly, the Court finds and holds that NBC's unjust enrichment claim should be dismissed.

### B.  NBC and Young's Motion to Dismiss

### i.  Breach of contract

NBC and Young argue that IPS's breach of contract claim is facially deficient. The elements of a valid contract include: '(1) an offer; (2) acceptance; (3) meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding.'" *R. P. Small Corp. v. Land Dep't, Inc.*, 505 F.Supp. 3d 681, 697 (S.D. Tex. 2020).[1] NBC and Young argue that IPS's breach of contract claim fails because IPS "fails to allege a specific offer, acceptance, or outline the material terms of the agreement" related to NBC and Young's representations that they could secure lines of credit for IPS. ECF No. 23 at 15–16. This argument misinterprets Defendants' claim. Defendants' breach of contract claim is

---

[1] IPS asserts that Wyoming law applies to the claim. *See* SAC ¶ 13. NBC and Young disagree, but note that Texas and Wyoming law do not materially differ as to these elements. *See Positive Progressions, LLC v. Landerman*, 2015 WY 138, ¶ 38, 360 P.3d 1006, 1019 (Wyo. 2015). In any event, Defendants have implicitly conceded that Texas and Wyoming law are substantively identical with respect to these elements, as Defendants do not contest NBC and Young's identification of the elements of a breach of contract claim. *See Reese v. Wells Fargo US Holdings, Inc.*, No. 19-CV-799-S-BK, 2020 WL 874807, at *1 (N.D. Tex. Jan. 30, 2020), *report and recommendation adopted*, No. 3:19-CV-0799-S-BK, 2020 WL 870227 (N.D. Tex. Feb. 20, 2020) ("[I]f a plaintiff fails to respond to an argument raised in a motion to dismiss, it is deemed to be abandoned." (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006))).

not based upon NBC and Young's representations that they could secure lines of credit; rather, it is based on (1) the Bond Agreement, and (2) IPS and Young's agreement that IPS would pay Young $100,000 and Young would secure funding for IPS. *See* SAC ¶¶ 24–31. Accordingly, the Court denies NBC and Young's Motion as to IPS's breach of contract claim.

### ii.   Economic loss rule

NBC and Young argue that claims two and four (fraud and tortious interference) are barred by the economic loss rule.[2] As mentioned above, the economic loss rule "generally prevents recovery in tort for purely economic damage unaccompanied by injury to persons or property." *Golden Spread Elec. Coop.*, 954 F.3d at 808. However, Texas courts recognize that in some scenarios, "a party's actions may breach duties simultaneously in contract and in tort." *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 62 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). In such a scenario, the economic loss rule does not bar tort claims that are tied to "an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Id.* (quoting *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex.App.-Houston [1st Dist.] 2007, pet. denied)).

### 1.   Whether the economic loss rule bars Defendants' fraud claim

NBC and Young assert that IPS's "fraud claims are nearly identical to [its] contract claims" and are therefore barred by the economic loss rule. ECF No. 23 at 13. Defendants point out,

> IPS has alleged that NBC and Young made two sets of material misrepresentations to NBC outside of any contract: (1) that they could secure a multi-million-dollar line of credit for IPS to acquire HFO in order to operate the Guatemalan Assets with a steady

---

[2] NBC and Young's Motion also argued that IPS and Hendrickson's money had and received claim was subject to the economic loss rule. At the hearing, however, they conceded that this claim is not subject to the rule at this stage. This Court agrees. *See Mayers v. Addison Brown, LLC*, No. 3:19-CV-3043-S, 2020 WL 7646973, at *4 (N.D. Tex. Dec. 22, 2020) ("[A]t the motion to dismiss stage, a plaintiff may maintain a money-had-and-received claim as an alternative to breach of contract."); *Rapid Tox Screen LLC v. Cigna Healthcare of Texas Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at *11 (N.D. Tex. Aug. 24, 2017) (same). IPS and Hendrickson's money had and received claim may proceed.

supply of fuel; and (2) that they could provide a $45 million line of credit in order to fund IPS's purchase of the Nicaraguan Assets. Dkt 19 at ¶ 33. Additionally, IPS has alleged that Young and NBC made fraudulent misrepresentations in order to induce IPS to enter the Bond Agreement, and that these misrepresentations were material to IPS entering the Bond Agreement and not looking for alternative funding sources.

ECF No. 28 at 3. The Court is of the opinion that IPS and Hendrickson's fraud claims related to the purported lines of credit are tied to separate injuries from the injuries tied to Defendants' breach of contract claims. IPS required a constant supply of huge amounts of fuel to power its Guatemalan assets. NBC and Young's temporally distinct representations that they could help secure funding for such fuel led to separate instances of lost profits. Put differently, if NBC and Young had complied with their contractual obligations pursuant to the Bond Agreement, that would not have obviated the need for a funding source to secure the AMEC deal and the Nicaraguan Assets. And, if NBC and Young were to fully comply with their alleged contractual obligations, that would not resolve IPS and Hendrickson's fraud claims. This outcome suggests that the economic loss rule does not apply. *See Lincoln Gen. Ins. Co.*, 787 F.3d at 726.

Moreover, Texas courts generally do not extend the economic loss rule to bar claims for fraud or fraudulent inducement. *See, e.g.*, *Peterson Grp.*, 417 S.W.3d at 62; *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011); *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998); *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 377–78 (Tex. App. 2012). Those courts reason that "the duty not to commit fraud is different from and independent of the duty to comply with the terms of a contract," *Peterson Grp.*, 417 S.W.3d at 63, and that "party is not bound by a contract procured by fraud," *Formosa Plastics Corp.*, 960 S.W.2d at 46; *see also Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (1957) ("In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of

one of the parties in procuring it." (quoting *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551, 558 (1941))).

All in all, taking the SAC's allegations together with Texas law, the Court concludes that the economic loss rule does not bar Defendants' fraud claims.

## 2. Whether the economic loss rule bars Defendants' tortious interference claim

Next, NBC and Young argue that "IPS's tortious interference claim in Count 4 similarly mirrors the allegations and claimed damages from the contract claim." ECF No. 23 at 14. This argument fails, as it reflects NBC and Young's misinterpretation of Defendants' breach of contract claim. Defendants' breach of contract claim only alleges wrongdoing stemming from NBC and Young's obligations under the Bond Agreement and Personal Services Contract. Defendants' tortious interference claims do not make any allegations related to the Bond Agreement or Personal Services Contract; they only reference NBC and Young's representations regarding purported lines of credit (which were not memorialized in a contract). *See* SAC ¶¶ 43–47. The economic loss rule does not bar this claim.

### iii. Fraud

Apart from their economic loss rule arguments, NBC and Young submit that IPS and Hendrickson's fraud claim should be dismissed for two reasons: (1) "the SAC's allegations do not meet the heightened pleading standards of Rule 9(b)"; and (2) NBC and Young's statements amount to "inactionable puffery rather than fraud," such that there could not have been justifiable reliance. ECF No. 23 at 16.

## 1. Whether the SAC's allegations meet Rule 9(b)'s requirements

NBC and Young argue that, in its allegations related to the Bond Agreement and lines of

credit, the SAC fails to allege facts that comply with Rule 9(b)'s requirements.

In relation to the Bond Agreement misrepresentations, NBC and Young argue that "the alleged misrepresentation is nothing more than a recitation of the element[s]—the SAC does not describe any facts establishing that NBC re-sold, distributed, marketed, or granted participation in any Bond, and certainly does not provide any allegation that NBC did not purchase Bonds 'entirely for [its] own account.'" ECF No. 23 at 19–20. However, the SAC alleges that "at the time it entered into the Bond Agreement, NBC had no intention of paying IPS for the issued bonds and both NBC and Young had every intention of using the issued bonds to their own advantage in transactions with third parties." SAC ¶ 34. It separately alleges that NBC entered into the Bond Agreement but did not deliver payment for bonds that IPS issued, and, on information and belief, used the bonds in a manner that violates the Bond Agreement. *Id.* at ¶¶ 10, 16. These allegations are sufficient to overcome Rule 12(b)(6) and Rule 9(b)'s pleading standards.

In relation to the alleged misrepresentations about the lines of credit, NBC and Young argue that the SAC's allegations are too vague to clear Rule 9(b)'s pleading requirements. As stated above, Rule 9(b) requires "the who, what, when, where, and how" of the circumstances constituting fraud to be laid out. *Benchmark Elecs.*, 343 F.3d at 724. Defendants note that the SAC alleges:

- NBC and Young made misrepresentations to IPS (the "who"), SAC at ¶ 33;
- NBC and Young misrepresented that they could, and did, secure $4 million and $45 million lines of credit for IPS's use, and that they would not use the Bond Agreement for their own purposes and benefit (the "what"), *id.* at ¶¶ 17–19, 33;
- NBC and Young made these misrepresentations starting in July 2021 during IPS's acquisition of the Guatemalan Assets and its efforts to obtain HFO from AMEC to operate the Guatemalan Assets, and while IPS was actively pursuing acquisition of the Nicaraguan Assets (the "when"), *id.* at ¶¶ 8–9, 17–19, 33;
- NBC and Young made these representations "often over the phone and via text messages" (the "where" and "how"), *id.* at ¶ 17.

The Court agrees with IPS that these allegations are pled with adequate particularity.

17

**2. Whether the SAC's allegations sufficiently establish justifiable reliance**

In order to recover on their fraud claim, IPS and Hendrickson must show: "(1) [NBC and Young] 'made a material representation that was false'; (2) [NBC and Young] 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;' (3) [NBC and Young] intended to induce [IPS] to act upon the representation; and (4) [IPS] actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). NCB and Young assert that Defendants' fraud claim must be dismissed because Defendants have not established the fourth element; that is, that they have not shown that IPS actually and justifiably relied upon NBC and Young's allegedly false representations.

NBC and Young argue that IPS could not have reasonably relied on their alleged representations "that they 'could' and 'did' secure two lines of credit for IPS's use," because those statements constituted vague and indefinite promises that cannot support a fraud claim as a matter of law. ECF No. 23 at 17 (citing SAC ¶¶ 17, 33); *see Simulis, L.L.C. v. Gen. Elec. Cap. Corp.*, 439 S.W.3d 571, 577 (Tex. App. 2014). NBC and Young point the Court to *Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank, N.A.*, a case in which the Seventh Circuit held that it was not reasonable for the plaintiff to treat a loan approval "as a certainty" simply because the bank officer with whom they were dealing gave them oral assurances that their loan application would be approved. 546 F.3d 839, 840, 846 (7th Cir. 2008). Judge Posner, writing for a panel, explained,

> Rational businessmen know that there is many a slip 'twixt cup and lips, that a loan is not approved until it is approved, that if a bank's employee tells you your loan application will be approved that is not the same as telling you it has been approved, and that if one does not have a loan commitment in writing yet the need for the loan is urgent one had better be negotiating with other potential lenders at the same time.

*Id.* at 846–47. While not binding on this Court, other courts outside of the Fifth Circuit have similarly held that businesspeople cannot be considered to have reasonably relied on "puffery" where they should have expected agreements to be memorialized in a written contract. *Firestone Fin., LLC v. Meyer*, Case No. 13-cv-07241, 2017 WL 714110, at \*10 (N.D. Ill. Feb. 23, 2017); *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078 (4th Cir. 1982); *Armstrong v. Rohm & Hass Co.*, 349 F. Supp. 2d, 83 n.16 (D. Mass. 2004); *Kimberton Chase Realty Corp. v. Main Line Bank*, No. CIV.A. 97-2767, 1997 WL 698487, at \*6 (E.D. Pa. Nov. 3, 1997); *G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1085, 1091 (D. Md. 1991); *R.I. Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (Mass. 1995). NBC and Young submit that IPS should have known and understood that the multi-million-dollar loans that NBC and Young promised "would be subject to documentation and terms regarding [re]payment and interest, among other things," and, "the alleged urgency of funding makes such reliance even more unreasonable." ECF No. 23 at 19.

While their reliance may ultimately be found to have been unjustified, IPS argues that at this stage, dismissal is not appropriate on these grounds because, under Texas law, "[t]he issue of justifiable reliance is generally a question of fact." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 811 (5th Cir. 2017). This is because the "question of justifiable reliance depends heavily on the relationship between the parties and their relative sophistication." *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). However, dismissal is nevertheless appropriate if a fraud plaintiff "blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation," *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)), or disregards "'red flags'

indicating such reliance is unwarranted," *id.* (quoting *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)).

IPS also distinguishes the out-of-circuit cases NBC and Young cite by pointing out four key differences. First, the representations made in this case were not vague and indefinite; instead, they contained specific and certain terms. *See* SAC ¶¶ 17–19. Second, unlike the bank officer who made oral representations that the bank would approve plaintiff's loan in *Classic Cheesecake*, NBC and Young made representations that *they* (rather than another party) would provide lines of credit. Third, NBC and Young's representations were that they *had* secured lines of credit, whereas the bank officer's representations in *Classic Cheesecake* were that the bank would, in the future, approve plaintiff's loan. Lastly, NBC and IPS had a longstanding relationship with Hendrickson, which, they argue, further shows that their reliance on his representations was justifiable. *See id.* at ¶ 7.

For purposes of its analysis, the Court separates Defendants' fraud claim into three subclaims, based on (1) NBC and Young's representations that they would follow the terms of the Bond Agreement, which induced IPS to enter into the Agreement; (2) NBC and Young's representations that they had secured a four-million-dollar line of credit for IPS to use to acquire HFO from AMEC; and (3) NBC and Young's representations that they had secured a $45 million line of credit to fund IPS's purchase of the Nicaraguan Assets. As to the first two subclaims, the Court agrees with IPS that the issue of justifiable reliance is a question of fact. Given the parties' prior relationship and dealings, and written and oral representations of specific terms of NBC and Young's offers, it cannot be said that IPS disregarded any "red flags" that should have alerted them to the falsity of these representations, such that their reliance is unreasonable as a matter of law.

By contrast, the Court concludes that IPS's reliance on NBC and Young's representations

that they had secured a $45 million line of credit was unreasonable as a matter of law. The promise of a $45 million dollar line of credit was for a considerably larger sum than previous dealings, and the promise came after NBC and Young allegedly failed to follow through on their promises related to the Bond Agreement and the AMEC deal. "[A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party". *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App. 2003) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). With regard to this final representation, Defendants appeared to ignore the fact that NBC and Young had not followed through on prior promises to supply lines of credit. Defendants merely trusted that—this time—NBC and Young would stick to their word, such that a written contract was not necessary. Defendants' reliance was unreasonable as a matter of law.

Therefore, the Court dismisses Defendants' fraud claim insofar as it is based in NBC and Young's representations that they had secured a $45 million line of credit to fund IPS's purchase of the Nicaraguan Assets. Defendants' fraud claim may proceed to the extent that it is based in NBC and Young's representations that they would comply with the terms of the Bond Agreement and that they had secured a $4 million line of credit to fund IPS's purchase of HFO.

### iv.   Tortious interference with prospective contracts

In order to establish a tortious interference claim in Texas, a plaintiff (or counter-claimant) must show: "(1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially

certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 775 (S.D. Tex. 2010) (Ellison, J.). NBC and Young argue that IPS and Hendrickson's tortious interference claim should be dismissed because the allegations are "conclusory and implausible." ECF No. 23 at 21.

The SAC alleges that there was a "reasonable probability that IPS would have entered into a business relationship with AMEC for the acquisition of HFO," and with "other financiers, apart from NBC to provide the steady stream of fuel necessary to operate the Guatemalan Assets," but that NBC and Young "willfully and intentionally interfered with those contracts by intentionally failing to provide" the promised lines of credit. SAC ¶¶ 44–45. NBC and Young essentially repeat their justifiable reliance arguments, arguing that Defendants' allegations are not plausible because "no reasonable person would believe that a multi-million-dollar line of credit was in place if no documents had been prepared and executed with the underlying financiers." ECF No. 23 at 22. But the SAC alleges that NBC and Young made several oral and written representations to both IPS and AMEC that they had secured a $4,000,000 line of credit for IPS to purchase HFO from AMEC, and that, only after NBC and Young failed to provide this funding, AMEC backed out of the agreement and refused to do business with IPS in the future. SAC ¶ 18. The Court finds that these allegations establish a reasonable probability that IPS and AMEC would have entered into a business relationship but for NBC and Young's actions.

However, after examining the pleadings, the Court concludes that Defendants have not met the Rule 12(b)(6) standard with respect to the non-AMEC prospective contracts. Defendants allege that, based on NBC and Young's representations that they had secured a $45 million line of credit, they "relied on [the representations] to enter into an agreement with the seller of the Nicaraguan Assets, conduct[ed] expensive due diligence, and draft[ed] the purchase agreement." *Id.* at ¶ 19.

But, as explained in section III.B.iii.2, *supra*, Defendants' reliance on NBC and Young's representations was unreasonable and the representations accordingly do not amount to an independently tortious or unlawful act.

The Court also finds that Defendants have not established that there was a reasonable probability that, but for NBC and Young's actions, they would have entered into a business relationship with other potential funders. Defendants' counterclaim alleges only that "NBC and Young took actions to prevent IPS from acquiring funding from other sources," including "representing to others that NBC and/or Young were owners of IPS to a potential financial source, which caused the financial source to question the ownership of IPS and thereafter to refuse funding to IPS." SAC ¶ 21. These allegations do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Accordingly, the Court denies NBC and Young's Motion to Dismiss with respect to count four of the SAC, in relation to Defendants' allegations tied to its prospective contract with AMEC. The Court grants the Motion with respect to the other alleged prospective business relationships.

### v.  Lost profit allegations

NBC and Young argue that the SAC does not include "allegations providing plausibility for the alleged lost profits." ECF No. 23 at 24. However, "it is well settled that a plaintiff need not demonstrate in its pleading the precise amount of damages that it will recover at the end of a case after discovery and trial." *AHBP LLC v. Lynd Co.*, No. SA-22-CV-00096-XR, 2023 WL 139714, at *8 (W.D. Tex. Jan. 9, 2023) (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 801–03 (5th Cir. 2011)). Thus, "'[a]t the motion-to-dismiss stage, a court's inquiry is limited to whether a complaint plausibly states a non-speculative claim for damages,' i.e., whether the damages are 'measurable.'" *Id.* (quoting *Rangel v. Adtalem Glob. Educ., Inc.*, No. SA-18-CV-

00082-JKP, 2019 WL 6828298, at *7 (W.D. Tex. Dec. 13, 2019)). As a general matter, disputes regarding calculations of damages are "best deferred until the fact-finding stages of the proceedings." *Cnty. of El Paso, Tex. v. Jones*, No. EP-09-CV-00119-KC, 2009 WL 4730345, at *12 (W.D. Tex. Dec. 4, 2009).

> In its SAC, IPS claims damages on two primary bases:
>
> (1) that it would have been able to purchase the Nicaraguan Assets but for Movants' failures to provide the promised funding and has estimated the lost earnings from the Nicaraguan Assets at more than $40 million; (2) that it would have been able to purchase fuel in bulk but for Movants' failures to provide the promised funding and has estimated that the increased fuel costs and operational delays to have caused lost profits of more than $24 million in its operation of the Guatemalan Assets.
>
> ECF No. 28 at 12 (citing SAC ¶¶ 19, 27, 37–38, 46).

These allegations are non-speculative and measurable. At this stage, before the parties have conducted any discovery, it is not appropriate to assess whether IPS has properly calculated these damage amounts. It is enough to hold that the damage allegations are sufficient to withstand a Motion to Dismiss. *See AHB*, 2023 WL 139714, at *8; *Hong Kong Aroma Star Int'l LLC v. Elta MD Inc.*, No. 3:18-CV-2228-G, 2020 WL 619898, at *4 (N.D. Tex. Feb. 7, 2020) (denying motion to dismiss that argued that plaintiff's "calculations of damages [were] so speculative as to warrant a dismissal," reasoning that damages were adequately pled as "it is plausible that the court could find that [plaintiff] suffered damages"). NBC and Young's Motion is denied insofar as it challenges IPS's lost profit allegations.

IV.    CONCLUSION

In sum, the Court **GRANTS IN PART AND DENIES IN PART** IPS and Hendrickson's Motion to Dismiss (ECF No. 18). The Court **DENIES** the Motion with respect to NBC's promissory estoppel claim. The Court **GRANTS** the Motion with respect to the remaining claims.

24

The Court **DISMISSES WITH PREJUDICE** NBC's quantum meruit, conversion, and unjust enrichment claims, as amendment of these claims would be futile. The Court **GRANTS** NBC **LEAVE TO AMEND** its complaint within **15 days** of the entry of this order. If necessary, Defendants may file a Motion to Dismiss within **15 days** of the filing of NBC's Second Amended Complaint.

The Court **GRANTS IN PART AND DENIES IN PART** NBC and Young's Motion to Dismiss (ECF No. 23). The Court **DENIES IN PART** the Motion to Dismiss with respect to Defendants' fraud claim. The claim may proceed, but Defendants may not recover based on allegations related to the purported $45 million line of credit. Similarly, the Court **DENIES IN PART** the Motion to Dismiss with respect to Defendants' tortious interference claim, noting that Defendants may only recover based on allegations of a prospective business relationship with AMEC. In all other respects, NBC and Young's Motion is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 22nd day of April, 2024.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE